UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH CORENO, | No. C 10-2372 SI (pr) |
| Plaintiff, | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Dr. LAWRENCE GAMBOA; Dr. SEPULVEDA, C.M.O., | |
| Defendants. | |

## INTRODUCTION

In this *pro se* prisoner's civil rights action under 42 U.S.C. §1983, Joseph Coreno has sued two health care providers at Salinas Valley State Prison concerning their responses to his medical needs. For the reasons discussed below, defendants' unopposed motion for summary judgment will be granted and judgment will be entered against plaintiff.

## BACKGROUND

Joseph Coreno's complaint alleges the following claims: (1) Dr. Gamboa and Dr. Sepulveda violated his Eighth Amendment rights by failing to provide necessary pain medication and arrange for back surgery, (2) Dr. Gamboa stopped his pain medication on one occasion in retaliation for the grievances and State Board of Control claim Coreno had filed against him, and (3) Dr. Gamboa and Dr. Sepulveda committed professional negligence in their response to his pain medication and back surgery needs.

The following facts are undisputed unless otherwise noted.

Joseph Coreno was incarcerated at Salinas Valley State Prison from April 2007 through April 2010, when he was transferred to Kern Valley State Prison. He has a history of back problems. He also has a history of substance abuse of methamphetamines, morphine and marijuana.

Defendant Lawrence Gamboa is a physician at Salinas Valley who treated Coreno during the time period of September 2009 through early 2010. Defendant Michael Sepulveda is a physician who has been the chief medical officer ("CMO") at Salinas Valley since October 2009. As the CMO, Dr. Sepulveda was in charge of handling requests for surgeries and chronos.

Coreno regularly complained of back pain while he was an inmate at Salinas Valley. This led prison medical care providers to have several tests done to evaluate Coreno's back pain complaints. An x-ray was done on June 1, 2007. The radiologist's impressions of the x-ray were two: "suspect L5-S1 discogenic disease" and there was "no evidence of acute fracture or malalignment." Sepulveda Decl., Ex. A at 2. An MRI done on August 8, 2007 showed "mild degenerative changes at L5-S1" but "no gross pathology." *Id.* at 3. Another MRI done on September 14, 2007 showed "small-to-medium sized subligamentous left posterolateral L5-S1 disk extrusion" and a normal thoracic spinal region *Id.* at 4. An electromyography ("EMG") was done on January 8, 2008. Following the EMG, Dr. Galicia diagnosed likely bilateral L5-S1 radiculopathy (i.e., a nerve abnormality), and recommended clinical and MRI correlation as well as possibly neurosurgery.

Coreno had a consultation in March 2008 with Dr. Kee Kim, the chief of spinal neurosurgery at U.C. Davis. Dr. Kim was against surgery for the patient at that time. At that time, Coreno reported experiencing severe chronic low back and leg pain since childhood. Dr. Kim reviewed an MRI which showed "L5-S1 relatively mild degenerative disc changes" and a "small disc bulge" at that locale. Dr. Kim concluded: "In summary, Mr. Coreno has degenerative disc disease with radiculopathy. However, I do not feel that surgery should be seriously considered at this time. I have encouraged him to continue to exercise and to try everything possible to avoid surgery." *Id.* at 14. Dr. Kim recommended an epidural steroid injection for symptomatic relief of pain.

On May 12, 2008, Coreno's prescription for morphine was temporarily cancelled when a nurse caught him trying to hoard his morphine.

On July 11, 2008, Michael Henry, M.D., a specialist in physical medicine and rehabilitation, evaluated Coreno. Dr. Henry concluded that the MRI showed "a small to medium size . . . disc extrusion" and that the EMG "was suggestive of a bilateral L5-S1 Radiculopathy." *Id.* at 19. Dr. Henry thought that Coreno was a candidate for steroid injections to reduce the need for long acting opiates. *Id.* at 19-20.

On October 16, 2008, Coreno was sent for a third consultation. This time, he saw Dr. Ramberg. Dr. Ramberg recommended surgery, finding severe degeneration. This was in contrast to Dr. Kim and Dr. Henry, who saw only mild to moderate degeneration and were against surgery at the time. Dr. Ramberg recommended two possible surgeries. After a second visit on February 5, 2009 to discuss the surgical options, Coreno chose one and eventually was scheduled for surgery.

On July 13, 2009, the date first scheduled for surgery, Coreno refused to be taken for surgery for personal reasons. *See id.* at 24, 25.

On November 6, 2009, Dr. Gamboa saw Coreno, rescheduled the back surgery and renewed Coreno's medications. Dr. Gamboa intended to refill all four of Coreno's medications (i.e., a stool softener, ibuprofen 600 mg., 30 mg. of immediate release morphine sulfate daily, and 45 mg. of sustained release morphine sulfate daily) but, due to a mistake on the form sent by the prison pharmacy, a mistake was made in the prescription refill that resulted in one of the three pain medications being ordered for once per day rather than twice per day. Dr. Gamboa gave this undisputed explanation of what had occurred:

> When medication is being refilled, CDCR doctors generally use a form called a "medication reconciliation form." The form lists all active prescriptions, the dosage, and the time(s) of day at which each medication is administered. The form has boxes which can be checked to denote medication refill or discontinuance. I checked the "refill" box for all four medications, and then rewrote by hand the typewritten prescriptions for the morphine sulfate and Oramorph at the form's bottom. [¶] The form listed Oramorph as being prescribed only once per day so that is how I rewrote the prescription for refill. However, the prior prescription (which I wrote for Mr. Coreno in September of that year) was for Oramorph *twice* per day, in the morning and night. A typographical error in the pharmacy department resulted in the word "night" being omitted from the form, so I was not aware that Mr. Coreno's prior prescription was for both morning and night. (I see hundreds of patients each month and rely on medication administration records to accurately portray prescriptions as I cannot remember each prescription that I write

3

months later.)

Gamboa Decl., ¶¶ 4-5. The error resulted in Coreno missing his night dose of Oramorph on November 10, 2009. Although the medication Coreno received that day was "not exactly" what Dr. Gamboa intended, it "was within the range permitted by the standard of care" and "did not expose [Coreno] to any medically inappropriate risk." *Id.* at ¶ 5.

On November 11, Coreno fell when he attempted to get out of bed, hitting his head and blacking out.[1] He awoke with severe pain. He eventually was taken to the correctional treatment center at the prison and was given a shot of pain medication. He continued to experience pain in his back and legs and then noticed his neck hurt also, because he had sprained his neck when he fell. There is no evidence that the fall was due to the missed dose of Oramorph; indeed, it is undisputed that "it is excessive narcotic medication that presents a fall hazard, not a reduction in the dosage of narcotic medication of the sort at issue." *Id.* at ¶ 6.

Coreno filed a grievance about Dr. Gamboa's medication reduction. He then recieved what Dr. Gamboa had intended: Oramorph in the morning and at night.

On November 16, 2009, Coreno again was scheduled for the back surgery by Dr. Ramberg. Coreno again refused surgery for personal reasons.

Dr. Gamboa saw Coreno on November 17, 2009. He offered Coreno muscle relaxants because Coreno was complaining of neck pain.

In November and December 2009, Coreno several times requested a medical hold so that he would not be transferred before his back problems were addressed. Dr. Gamboa submitted requests for a medical hold, although he had no role in deciding whether to grant such a request. Dr. Sepulveda denied the requests because he "did not find any objective reason" for a medical hold. Sepulveda Decl., ¶ 20. Medical holds are reserved for situations where transferring an inmate will cause harm in some way. Sepulveda noted that Coreno had twice declined surgery, did not have any pending appointments or other purpose to remain at Salinas Valley, and would

---

[1] Defendants question whether Coreno actually fell. They note that the medical triage records show that Coreno denied falling when questioned about it in his housing unit. And Dr. Gamboa now thinks that Coreno was exhibiting drug-seeking behavior. Gamboa Decl., ¶ 7. For summary judgment purposes, the court accepts non-movant Coreno's version, i.e., that he did fall.

not be harmed by a transfer.

Dr. Sepulveda also denied Dr. Gamboa's request to send Coreno back to Dr. Ramberg for surgery. The denial was based on the fact that two doctors had not recommended surgery because Coreno had only mild to moderate radiculopathy and minor degenerative changes.[2] Also, in Dr. Sepulveda's opinion, "the diagnostic testing did not corroborate Dr. Ramberg's opinion regarding severe degeneration. Because Dr. Ramberg's conclusion clashed with the diagnostic tests, and the opinions of Drs. Kim, Henry and myself, and because InterQual standards indicated surgery was inappropriate," Dr. Sepulveda determined a surgical referral was not indicated and denied the request for a medical hold because a transfer would cause no harm. Sepulveda Decl., ¶ 21.

On January 15, 2010, Dr. Gamboa saw Coreno again and at that time lowered the dosages of pain medications for Coreno. Dr. Gamboa decreased the dosage because Coreno "was taking an extremely high dosage and still requesting more. He was on two different types of morphine. Taking such medications entails a risk of developing both dependence and tolerance over time." Gamboa Decl., ¶ 20. Dr. Gamboa thought Coreno had developed such a tolerance and dependence and therefore decided "that he needed to be slowly weaned off the morphine-based medications" so that they eventually could be replaced with non-narcotic pain medications to better address his back pain. Gamboa Decl., ¶ 21. Dr. Gamboa stated that "[t]his was sound medical judgment, not motivated in any way by any grievance Mr. Coreno may have filed."

---

[2] Dr. Sepulveda explained how the CDCR determines whether surgery is medically indicated:

> [T]he CDCR has a system in place called "InterQual" to determine whether surgery is medically indicated based on specified criteria. InterQual is a system established by McKesson, a health care company, to improve quality and efficiency in medical care. It is used both inside and outside of the correctional setting. For back surgery: (a) a patient must have an MRI showing severe nerve impingement in a specific location, (b) an electromyography test (EMG) must confirm severe abnormality in that same area and (c) the patient's complaints also must correspond to that area. All three factors must confirm severe problems in the same location. If the subjective and objective findings do not comport with one another, surgery likely will not improve the situation, and could exacerbate it.

Sepulveda Decl., ¶ 10.

Gamboa Decl., ¶ 21. He thought there should not have been a noticeable increase in discomfort with the slight change in dosage he made. *Id.*; *see also* Sepulveda Decl., ¶ 23 (even with the reduction, Coreno "was still on a fairly high dose of pain medication, which should have been more than sufficient to address his pain").

The next day, Coreno claimed that his back went out again. He walked to the correctional treatment center, where a nurse noted a bump on his head and that he was stable, alert and oriented. He was returned to his cell. Coreno was scheduled for the doctor's line in response to his medical request slips. Dr. Gamboa evaluated him on January 22, 2010 and ordered an x-ray due to Coreno's complaint of neck pain. The x-ray showed no fracture, malalignment or significant prevertebral soft tissue swelling.

Dr. Gamboa saw Coreno on January 29, 2010 for the last time regarding back pain. Dr. Gamboa noted that the patient complained of pain and tried a different combination of pain medications. (Another health care provider adjusted the pain medications again on March 19, 2010.)

Coreno submitted numerous inmate requests claiming facial pain in the following weeks; a care provider ordered Motrin and an x-ray (which showed no fracture and was normal).

Coreno states that, in addition to a grievance he filed on or about January 15, he sent a letter to Dr. Sepulveda on February 28, 2010 asking him to help with treatment and the problems Coreno was experiencing. Coreno states that Dr. Sepulveda "denied and refused to provide any treatment." Complaint, p. 8. Dr. Sepulveda states that he never received a letter from Coreno. Had he received such a letter, he "would not have believed Mr. Coreno was receiving anything other than appropriate and responsive care." Sepulveda Decl., ¶ 27. Dr. Sepulveda notes that Coreno saw medical staff frequently (i.e., 13 times) in the first quarter of 2010 until his transfer to another prison on April 13, 2010. An order continuing his pain medication until a provider at the new prison could assess him was faxed prior to his arrival at the new prison.

The medical administrators at Kern Valley concurred with Dr. Sepulveda's assessment that the objective criteria did not indicate a need for back surgery, and denied Coreno's request for referral for surgery.

6

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to Coreno's complaint occurred in Monterey County, located in the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). This Court has federal question jurisdiction over this action under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, as is the situation with defendants' challenge to the Eighth Amendment and retaliation claims, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's

verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, statements of fact in the amended complaint and opposition are considered as evidence for purposes of deciding the motion because both were made under penalty of perjury.

The court's function on a summary judgment motion is not to make credibility determinations nor to weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *Id.* at 631.

**DISCUSSION**

A.   Eighth Amendment Claims

Deliberate indifference to a prisoner's serious medical needs amounts to the cruel and unusual punishment prohibited by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Accordingly, evaluating a claim of deliberate indifference necessitates examining "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds, WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id.* (quoting *Estelle*, 429 U.S. at 104). A prison official exhibits deliberate indifference when he or she knows of and disregards a substantial risk of serious harm to inmate health. *See Farmer*, 511 U.S. at 837. The official must both know of "facts from which the inference could be drawn"

8

1  that an excessive risk of harm exists, and he or she must actually draw that inference. *Id.* A
2  mere difference of opinion as to which medically acceptable course of treatment should be
3  followed does not establish deliberate indifference. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th
4  Cir. 1989). Where doctors have chosen one course of action and a prisoner-plaintiff contends
5  that they should have chosen another course of action, the plaintiff "must show that the course
6  of treatment the doctors chose was medically unacceptable under the circumstances, . . . and the
7  plaintiff must show that they chose this course in conscious disregard of an excessive risk to
8  plaintiff's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations
9  omitted).

10   The evidence in the record is sufficient to show at least a triable issue of fact that Coreno
11  had back pain.

12   The focus here is on the subjective prong of the Eighth Amendment test, i.e., whether
13  defendants were deliberately indifferent in their response to Coreno's back pain. Having
14  carefully reviewed the evidence, the court concludes that no reasonable jury could find in
15  Coreno's favor on his Eighth Amendment claims with regard to the surgery or the medication
16  reductions.

17   Coreno has failed to show a triable issue of material fact on his deliberate indifference
18  claim with regard to the desired back surgery. Although Coreno had twice been scheduled for
19  surgery and twice declined it,[3] Dr. Sepulveda has presented undisputed evidence showing that
20  his decision to deny a third referral for surgery was medically appropriate rather than
21  deliberately indifferent. The evidence is undisputed that the prison medical care providers had
22  objective standards for determining when surgery was warranted and that Coreno's back
23  problems did not satisfy those objective standards (i.e., he did not have an MRI showing severe
24  nerve impingement or an EMG confirming a severe abnormality). The evidence also is
25  undisputed that two of the three doctors consulted disfavored surgery. Although one doctor (i.e.,
26  Dr. Ramberg) wanted to do surgery, that only demonstrates that there was a difference of

---

[3]Coreno may quibble as to the particular reasoning that led him to decline, but it is undisputed that surgery did not go forward on two occasions because he chose to decline it.

9

opinion among doctors. Coreno presented no evidence in opposition to defendants' evidence that back surgery likely would not have improved his condition. To survive summary judgment, Coreno had to – but did not – provide evidence that the course of treatment the medical staff chose was "medically unacceptable under the circumstances" and that the course was chosen "in conscious disregard of an excessive risk" to Coreno's health. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

Coreno also has failed to show a triable issue of material fact on his deliberate indifference claim with regard to the decrease in his nighttime medication on November 10, 2009. He does not dispute that the missed dosage was due to a mistake on the medication refill form presented to Dr. Gamboa for his consideration. There is no evidence that Dr. Gamboa intended Coreno not to get his dose of pain medication that night. There was a mistake, but the mistake here does not rise to the level of deliberate indifference. Viewing the evidence and all reasonable inferences therefrom in the light most favorable to Coreno, no reasonable jury could conclude that Dr. Gamboa knew of and consciously disregarded a risk to Coreno's health or safety when he re-ordered the medications that omitted the night dosage on November 10, 2009.

Coreno also has failed to show a triable issue of fact on his deliberate indifference claim with regard to the decrease in narcotic pain medication ordered by Dr. Gamboa on January 15, 2010. The evidence is undisputed that Dr. Gamboa purposefully reduced the pain medication to be administered to Coreno in an effort to slowly wean the patient off the undesirably high level of narcotic pain relievers he was taking so those medications eventually could be replaced with non-narcotic pain medications. There is uncontroverted evidence from three different doctors (both defendants and their expert, Dr. Hill) that reducing Coreno's narcotic pain medication was medically appropriate. It also is undisputed that Dr. Gamboa anticipated that the slight reduction in the pain medications – which only reduced (but did not eliminate) one of the three medications – would not result in the patient having a noticeable increase in discomfort. On the evidence in the record, no reasonable jury could find deliberate indifference with respect to the January 15, 2010 reduction in narcotic pain medication. *Cf. Toguchi v. Chung*, 391 F.3d 1051, 1059 (9th Cir. 2004).

Defendants have met their burden on summary judgment of showing the absence of evidence that they acted with the deliberate indifference necessary for an Eighth Amendment violation. When the evidence is viewed in the light most favorable to Coreno, and inferences therefrom drawn in his favor, no reasonable jury could return a verdict for him and against defendants on his Eighth Amendment claims. Defendants therefore are entitled to judgment as a matter of law on the Eighth Amendment claims.

B.    Retaliation Claim

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). .

Coreno alleges in his complaint that Dr. Gamboa reduced his narcotic pain medication on January 15, 2010 in retaliation for his inmate grievances and complaint to the California Medical Board about Dr. Gamboa. There is evidence that Coreno had engaged in protected conduct (i.e., the filing of the inmate grievances and complaint to the California Medical Board), but absolutely no *evidence* that Dr. Gamboa was aware of such conduct at the time Gamboa reduced the medicine. Coreno's unsupported speculation that the former caused the latter would not be sufficient for a jury to find in his favor. Moreover, Coreno does not dispute that the reduction in morphine advanced a legitimate medical purpose. *Cf. Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994) (summary judgment proper for defendants on claim of retaliatory reclassification when the reclassification was supported by "some evidence" and served a legitimate penological goal). The undisputed evidence shows that Dr. Gamboa was exercising sound medical judgment when he decided to decrease the dosage of one of Coreno's pain medications because he thought the patient had developed a tolerance for and dependence on the morphine. Viewing the evidence and the reasonable inferences therefrom in the light most

11

1 favorable to plaintiff, no reasonable jury could find in his favor on the retaliation claim. Dr.
2 Gamboa is entitled to judgment as a matter of law on this claim.

C.  Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists. First, the court asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail. *See id.* If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. . . . 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201-02 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Although *Saucier* required courts to address the questions in the particular sequence set out above, courts now have the discretion to decide which prong to address first, in light of the particular circumstances of each case. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As discussed in the preceding section, the evidence in the record does not establish a violation of Coreno's constitutional rights. Defendants prevail on the first step of the *Saucier* analysis. Even if a constitutional violation had been shown, however, defendants would prevail on the second step of the *Saucier* analysis. With the undisputed evidence being that the patient did not satisfy the objective criteria for obtaining a surgery and where there was a divergence of opinions among the doctors with regard to whether back surgery was warranted, a reasonable prison doctor would not have understood that denying a third referral for surgery would violate

12

the prisoner's Eighth Amendment rights.  Similarly, with the undisputed evidence that the patient was on an undesirably high level of narcotic pain medication and no noticeable effect on discomfort was expected from a slight reduction in one of the narcotic pain medications, a reasonable prison doctor would not have understood that attempting to wean the prisoner-patient off one narcotic pain reliever violated that inmate's constitutional rights under the Eighth Amendment or First Amendment.  Defendants are entitled to judgment as a matter of law on the qualified immunity defense.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. (Docket # 17.)   Defendants are entitled to judgment as a matter of law on the merits of the Eighth Amendment and retaliation claims and on their defense of qualified immunity.  Judgment will be entered in all defendants' favor and against plaintiff on his § 1983 claims.  Having resolved the § 1983 claims, only state law claims remain, and the court declines to exercise supplemental jurisdiction over them.  *See* 28 U.S.C. § 1367(c)(3).

The clerk will close the file.

IT IS SO ORDERED.

Dated: December19, 2011                                    _____
                                                                                SUSAN ILLSTON
                                                                           United States District Judge